**PETER KIEWIT SONS' CO., Plaintiff,**

v.

**U. S. ARMY CORPS OF ENGINEERS, U. S. Department of the Army, and U. S. Department of Defense, Defendants.**

Civ. A. No. 81–3192.

United States District Court,
District of Columbia.

Feb. 26, 1982.

Terry Albertson and W. Stanfield Johnson of law firm of Cromwell & Moring, Washington, D. C., for plaintiff.

Dayton Lehman and John Oliver Birch, Asst. U. S. Attys., Cynthia Kaywell, Tony Trumbly, Kathy Kurk and Martin R. Cohen, Washington, D. C., for defendants.

Robert Losch, Washington, D. C., for amicus Dillingham Western.

Susan Berghoef, for amicus State of Hawaii.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

The Court, having considered the entire record, including the pleadings, testimony and exhibits presented at a hearing on February 2, 1982, the memoranda and arguments of counsel, and the stipulations filed by the parties, now makes the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Any Finding of Fact which is also a Conclusion of Law is to be treated as both, as is any Conclusion of law which is also a Finding of Fact.

## FINDINGS OF FACT

*Nature of Cause of Action*

1. Kiewit complains that Defendants would, unless constrained by this Court, wrongfully reject Kiewit's low bid on a contract at Barbers Point Harbor, Hawaii, and award the contract to the next bidder at an additional cost to the taxpayers of more than $2,750,000, because of an illegal *de facto* debarment or suspension. (Verified Complaint ¶ 1).

2. Kiewit seeks a declaratory judgment that the threatened action by the Defendants in *de facto* debarring or suspending Kiewit by denying Kiewit contracts on which it is low bidder—including, particularly, the Barbers Point Harbor, Hawaii, contract in response to Solicitation DACW 84–81–B–0033—would (a) violate the Fifth Amendment of the United States Constitution by depriving Kiewit of liberty and property interests without due process, and (b) violate applicable regulations, be illegal and arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706. (Verified Complaint ¶ 2).

3. Kiewit seeks permanent injunctive relief consistent with this declaration and the Findings of Fact set forth herein. (Verified Complaint ¶ 3).

*The Parties*

4. Peter Kiewit Sons' Co. (where specifically referred to, "Kiewit Co.") is a corporation organized under the laws of Nebraska and having its principal place of business in Omaha, Nebraska. Kiewit Co. is a major subsidiary of Peter Kiewit Sons', Inc. (where specifically referred to, "Kiewit Inc."; generally "Kiewit"), a Delaware Corporation. Kiewit is a respected, major contractor, engaged in all types of construction work. (Joint Stipulation of Facts ¶ 1; Testimony of Walter Scott, Jr., and Plaintiff's Exhibits Nos. 24, 25, 27 and 28).

5. Kiewit is a large corporate organization with many subsidiary divisions and corporations. It currently has in excess of 11,000 employees. For the last three years, Kiewit has averaged approximately 400–450 on-going construction projects and 25 joint-ventured projects, including many major projects. In each of the years 1980 and 1981, Kiewit's total revenues exceeded $1.2 billion. (Testimony of Walter Scott, Jr., and Plaintiff's Exhibits Nos. 23, 26A and 26B).

6. A substantial portion of Kiewit's work has been in contracts directly with the United States Government. From 1970 to 1981, for example, Kiewit was awarded federal construction projects with a total value of $1,301,693,883. Among the many projects it has constructed are the following national-defense-related facilities: Ft. Lewis, Offutt Air Force Base, Thule Air Force Base, Ballistic Missile Early Warning Systems (BMEWS) facilities, Defense Early Warning (DEWLine) stations, gaseous diffusion plants, and both Titan and Minuteman Missile facilities. Kiewit has a record

of high quality, on-schedule performance. (Joint Stipulation of Facts ¶ 2; Testimony of Walter Scott, Jr., and Plaintiff's Exhibits Nos. 25, 26A and 26B).

7. The value of Kiewit as a competitor for Government contracts is significant. In the period from 1970 to 1981, Kiewit bid on 926 Federal construction projects and was low bidder on 108. The resulting savings to the Government (represented by the difference between the Kiewit low bids and the second low bids) was $108,766,710. For the Department of Defense alone, Kiewit bid on 545 projects and was low bidder on 68, with the resulting savings to the Department of Defense of $90,255,297. (Testimony of Walter Scott, Jr., and Plaintiff's Exhibits Nos. 26A and 26B).

8. Defendants Corps of Engineers, Department of the Army, and Department of Defense (referred to collectively as Defendants, separately as the Corps, the Army, and DOD) are related government agencies charged with responsibility for, *inter alia*, conducting defense procurement in accordance with the Constitution and applicable laws. The Department of the Army—in particular, the Judge Advocate General for Civil Law (JAG)—has cognizance over formal debarment proceedings. The Corps of Engineers has procurement responsibility for many military construction projects, including the Barbers Point contract. (Joint Stipulation of Facts ¶ 3).

*The Barbers Point Procurement, the Contracting Officer's Determination With Respect to Kiewit's Responsibility, and the Contracting Officer's and the Corps' Recommendation That Award Be Made to Kiewit*

9. Bids in response to Solicitation DACW 84–81–B–0033, for Barbers Point Harbor, were opened on August 27, 1981. (Joint Stipulation of Facts ¶ 9). There were eight bidders from locations around the country and the world. They were:

Peter Kiewit Sons' Co.

Dillingham-Western (Joint Venture)

Riedel-E. E. Black (Joint Venture)

Granite Const. Co.-American Dredging Co. (Joint Venture)

Morrison-Knudsen Co., Inc. & Great Lakes Dredge & Dock Co. (Joint Venture)

Maeda Construction Co., Ltd.

M. A. Segal, Inc. & Manson Constr. & Engr (Joint Venture) dba Segal-Manson

Groves, Dunbar & Sullivan (Joint Venture)

(Plaintiff's Exhibit No. 1).

10. Kiewit Co.'s bid of $48,977,000 was low. The second low bid was in the amount of $51,732,215. Kiewit's low bid represented a potential saving of public funds in the amount of $2,750,000. (Joint Stipulation of Facts ¶ 9).

11. In a September 3, 1981 memorandum to the Commander of the U. S. Army Corps of Engineers, entitled "Award to Peter Kiewit Sons' Co., Barbers Point Deep Draft Harbor, Oahu, Hawaii," the Contracting Officer (Alfred J. Thiede, Colonel, Corps of Engineers) recommended that award be made to Kiewit as the lowest responsive and responsible bidder. (Plaintiff's Exhibit No. 1; DAR § 1–902; see Joint Stipulation of Facts ¶ 16).

12. The Contracting Officer made this specific finding:

I find that in this instance of the bidding process there was no violation of the Sherman Act or any other statute.

(Plaintiff's Exhibit No. 1, ¶ 18).

13. The Contracting Officer, in his September 3, 1981 memorandum, provided the following "Supporting Logic":

16. The present situation is such an instance where it would be in the best interest of the Government to award a contract to Kiewit, notwithstanding the current abeyance or the potential debarment or suspension for the following reasons:

a. There is no evidence available here that shows or indicates that Kiewit conspired with the other bidders on the Barbers Point project to establish the low bid. It is quite obvious by the recorded bids that such did not happen, and this is

further supported in that the bid was submitted by a sub-office of Kiewit in the State of Washington.

b. Under the circumstances which Kiewit (the parent company) found itself, and having paid the price for wrongdoing, such should end the matter—at least for all work other than that along the Missouri River of the $1 million category formerly done by Cunningham-Kiewit. The reputation of Kiewit is well known, and all of it is good, for previous large and complex jobs such as for the missile and anti-missile construction projects, and even for its part in the Tripler Army Medical Center (1500 bed capacity) in Honolulu some thirty-three years ago (dedicated 9 September 1948).

c. The Government would be hurting itself to not make an award to Kiewit, or insisting on an award to Kiewit if that became necessary. It is understood, however, that Kiewit desires the contract notwithstanding the substantial difference between it and the next low bidder.

d. The regulations do not require a debarment or suspension, and certainly not for punishment; and even if such did happen the regulations still allow an award if it is to the best interest of the Government. During the current abeyance period it is within the authority of the Corps of Engineers to allow the award of a contract.

(Plaintiff's Exhibit No. 1).

14. On October 30, 1981, Major General E. R. Heiberg, Director of Civil Works, Corps of Engineers, recommended to the Assistant Secretary of the Army (Civil Works) that award of the Barbers Point contract be made to Kiewit. (Plaintiff's Exhibit No. 2). As General Heiberg said in his October 30, 1981 transmittal memorandum,

Perhaps at the top of my list, the Government may lose a very good bid and half a year if we wait longer on the important Barbers Point project. I believe the proper course of action to take now is to move out and award these contracts we can justify as needed.

15. General Heiberg transmitted to the Assistant Secretary a draft memorandum for the Secretary of the Army which recommended, *inter alia*, award of the Barbers Point contract to Kiewit. (Plaintiff's Exhibit No. 3). This memorandum specifically identified the Barbers Point contract and Peter Kiewit as low bidder in Tab B, entitled "PROPOSALS WHERE LOW BIDDER LISTED ON DEBARMENT RECOMMENDATION." Tab B stated, in connection with the Barbers Point contract, nection with the Barbers Point contract, "ACTION RECOMMENDED IN ACCORDANCE WITH CC [Chief Counsel] RECOMMENDATIONS TO JAG":

Award to low bidder. Outside geographic boundary.

(Plaintiff's Exhibit No. 3, Tab B).

16. The Assistant Secretary of the Army for Civil Works (William R. Gianelli) signed this memorandum on November 2, 1981, advising the Secretary of the Army that the Chief of Engineers intended to award the Barbers Point contract to Kiewit "as soon as you have been informed." (Plaintiff's Exhibit No. 3, ¶ 4).

17. Contemporaneously, Kiewit's counsel was advised by General Heiberg that the Corps was seeking approval to make the Barbers Point contract award to Kiewit. (Testimony of Richard L. Coyne).

*The De Facto Debarment or Suspension of Kiewit and Resulting Denial of the Barbers Point Award*

18. Notwithstanding Kiewit's low bid, the findings of the Contracting Officer, and the determinations of General Heiberg, award has not been made to Kiewit. The denial of the Barbers Point contract award has resulted from a sequence of events beginning with criticism of the Corps of Engineers from Congressional sources for its decision to continue doing business with Kiewit and 15 other contractors who had been convicted of anticompetitive practices in connection with river bank stabilization work on the Missouri River. (Plaintiff's Exhibit No. 4; *see also* Plaintiff's Exhibit No. 5). This was the subject of criticism of high Department of Defense officials at a

Congressional hearing on July 28, 1981. (Plaintiff's Exhibit No. 4). For example, at that hearing the following exchange occurred:

*Senator Levin* : I want to go back to another case which is the debarment by another agency which should be presumptively binding on you other than for compelling reasons. In the case of the Engineering Corps, again I said there were 15 companies, nine individuals convicted of bid rigging against the Army Corps of Engineers. Since the date of indictment $250 million in contracts were awarded. Listen to this. Since the date of conviction, $81 million in new contracts has been awarded. One contractor for $31 million was awarded four months after the conviction of the contractor. We have looked at nine of those post conviction contracts. In seven of the nine contracts there was at least a nonindicted bidder.

Another one. The reason that the Army Corps gave for not debarring, which is that these companies were needed to do the job, was not true in seven of nine contracts that we looked at.

Now we have had hearings on fraud that is perpetuated against government agencies, not just against DOD. Our hearings in the Subcommittee on Governmental Affairs that Senator Cohen (p. 78) chairs, goes much beyond, but we came up with examples both where DOD does not give presumptive validity to other agencies disbarring. Now this case comes to my attention which I frankly find to be unbelievable.

*Mr. Carlucci* : I find it to be unbelievable as well. I certainly would like to look into that.

(Plaintiff's Exhibit No. 4 at 2–3).

19. As a result of this criticism, shortly after the hearing the Chief Counsel of the Corps of Engineers, Lester Edelman, received an unusually large number of inquiries from the Department of Defense and Army officials concerning the Corps' continuing contracting with the river bank stabilization contractors. (Testimony of Lester Edelman). In response to these inquiries, Mr. Edelman briefed several officials—including the General Counsel of the Army, the Assistant Secretary of the Army for Civil Works, and the Special Assistant Secretary of Defense—on the Corps' position with respect to debarment of the river bank contractors. (Testimony of Lester Edelman).

20. Also shortly after the hearing, on July 31, 1981, Senator Levin submitted questions to the Secretary of the Army concerning the Corps' dealings with the river bank contractors. These questions were passed down to the Corps, through Department of Defense channels, to be answered. (Testimony of Lester Edelman).

21. From September 1978 (the date of the agreement on the *nolo contendere* plea) to August 19, 1981, Defendants had continued to award contracts to Kiewit. (Testimony of Richard L. Coyne; Plaintiff's Exhibit No. 6). On at least 12 different occasions in this period, Defendants in the exercise of procurement discretion determined Kiewit to be responsible. (Testimony of Richard L. Coyne; Plaintiff's Exhibits Nos. 6 and 35; DAR §§ 1–902, 1–904; Joint Stipulation of Facts ¶ 15). No evidence suggesting the irresponsibility of Kiewit resulted from award and performance of these contracts.

22. Then, on August 19, 1981, the Corps issued an internal directive to all of its divisions and districts holding in abeyance all contracts where Kiewit (and the 15 other river bank stabilization contractors) was low bidder, "pending review of debarment reports." (Plaintiff's Exhibit No. 7). The August 19, 1981 directive was not restricted in terms of time or the contracts to which it might apply. (Plaintiff's Exhibit No. 7). Pursuant to this directive, awards to Kiewit were suspended indefinitely. (Plaintiff's Exhibit No. 7). The directive, in the words of Defendants to the United States District Court for the Eastern District of Louisiana, was a "temporary declaration of ineligibility." (Plaintiff's Exhibit No. 8).

23. The August 19 directive was issued without notice to Kiewit pursuant to DAR

§ 1–600 *et seq.* and without opportunity for a hearing to present and have considered evidence relating to the question of Kiewit's present responsibility. (Joint Stipulation of Facts ¶ 22).

24. Kiewit was not advised of the August 19, 1981 directive until after the bid opening at Barbers Point, when the Contracting Officer advised that there was a hold on awards to Kiewit. (Testimony of Richard L. Coyne). Upon inquiry to the Chief Counsel of the Corps of Engineers, Kiewit was advised of the substance of the August 19, 1981 directive. Kiewit was also advised that there had been Congressional criticism about the Corps's decision to take no debarment action against the river bank stabilization contractors. (Testimony of Richard L. Coyne and Lester Edelman).

25. Not only has the Barbers Point contract award been jeopardized because of the August 19, 1981 directive, Kiewit was deprived of the award of the Corps contract for channel restoration of the Cuyahoga and Old River because of the delay attendant to "obtaining an exemption . . . from the policy stated in the 19 August 1981 twx entitled 'Contract Actions For Specific Contractors.'" (Plaintiff's Exhibit No. 9, ¶ 2). Kiewit had been low bidder in response to the solicitation by $544,125. On November 17, 1981, Kiewit's low bid was rejected and award not made due to delay. No incapacity or irresponsibility in connection with the submission of the Cuyahoga bid was found or suggested by the Corps. (Plaintiff's Exhibit No. 9).

26. The Corps of Engineers has awarded one contract to Kiewit in the period subsequent to the August 19, 1981 directive. On November 19, 1981, Big Horn Construction Company, a Kiewit subsidiary, was low bidder by $356,000 on a contract for maintenance dredging on the Alameda Naval Air Station, Alameda City, California. (Plaintiff's Exhibit No. 10). This award was justified by General Heiberg in a memorandum dated November 27, 1981, with the following statements:

In order to meet the 15 January 1982 critical operational requirements of the Navy in connection with deep draft aircraft carrier operations, it is necessary that a decision on how to proceed with maintenance dredging for Alameda Naval Air Station be made by 30 November 1981.

(Plaintiff's Exhibit No. 10, ¶ 2d). The only factor suggesting to General Heiberg that an award should not be made to Kiewit was that "the Army could be criticized by congressional interests or the public" if the award were to be made. (Plaintiff's Exhibit No. 10, ¶ 3a).

27. Award of the Alameda dredging contract was made with the concurrence of Assistant Secretary Gianelli on November 27, 1981. (Plaintiff's Exhibit No. 11). There is no evidence to suggest that award of the Alameda Naval Air Station contract has damaged the interests of the United States in any way or that Kiewit lacks the responsibility to perform the contract.

28. In contrast, the efforts of the Contracting Officer, General Heiberg, and Assistant Secretary Gianelli (see Findings of Fact 11–17, above) to award the Barbers Point contract to Kiewit failed. The recommendations of the Assistant Secretary for Civil Works were not approved. As General Heiberg's memorandum for the record dated November 10, 1981 reports:

[Mr. Gianelli] briefed SecArmy this morning, and the Secretary is "concerned." . . . It would be difficult (for us and the Administration) if the Corps said "go ahead" and JAG then reveals it's leaning in a different direction. My understanding is that we should not move now in the direction I felt we should (i.e., award if such award meets the Chief's recommendation).

(Plaintiff's Exhibit No. W 12, ¶ X⅖).

29. Kiewit representatives were advised by General Heiberg that their efforts to award the Barbers Point contract to Kiewit were blocked by higher authorities because of concern about future criticism. (Testimony of Richard L. Coyne).

30. The potential for future Congressional criticism was considered by the Corps

in making its procurement decisions with regard to the river bank contractors. (Testimony of Lester Edelman).

31. On December 16, 1981, Kiewit was advised by the Corps' Contracting Office in Hawaii that its low bid was being rejected and that award would be made to the second low bidder. Kiewit protested. (Testimony of Richard L. Coyne). Notwithstanding the protests, the Corps determined to proceed with award to the second low bidder and set the award for December 30, 1981, in order that Kiewit might have time to pursue its recourse in court. (Plaintiff's Exhibit No. 13). Award has been stayed by temporary restraining order and consent of Defendants.

32. The threatened action is not based on any finding that Kiewit is not capable of performing the contract or any finding that its Barbers Point bid was improper in any way. (Joint Stipulation of Facts ¶ 25). There is no evidence of irregularity or irresponsibility in Kiewit's approach to this procurement. Indeed the Contracting Officer specifically found that there was no impropriety. (Plaintiff's Exhibit No. 1).

33. The basis for the threatened action is the Corps' belief that a notice of proposed debarment dated December 10, 1981 requires this result. (Plaintiff's Exhibit No. 14, ¶ 4).

34. On December 16, 1981 Corps Headquarters advised the Barbers Point Contracting Officer of the notice of proposed debarment and authorized award to the second low bidder. (Plaintiff's Exhibit No. 15). On December 17, 1981 the Barbers Point Contracting Officer, by this time Kenneth E. Sprague (Lt. Colonel, Corps of Engineers), declared that, because of the December 10, 1981 notice of proposed debarment, he was "unable to make an affirmative determination that Peter Kiewit Sons' Co. is responsible within the meaning of DAR 1–902 and 1–903." (Plaintiff's Exhibit No. 14, ¶ 4).

35. The proposed award to the second low bidder was approved, notwithstanding the pending protest, by the Chief Counsel of the Corps, who noted that the Contracting Officer's inability to make an affirmative responsibility determination was based upon and arose from the December 10, 1981 notice of proposed debarment. (Plaintiff's Exhibit No. 13, ¶ 5).

36. The December 10, 1981 notice does not properly apply retroactively to the August 27, 1981 Barbers Point procurement, but, even if it did, the notice does not require the threatened action. (Plaintiff's Exhibit No. 16). It explicitly allows Kiewit "to submit offers in Department of Defense procurements" and permits awards to Kiewit if "it is determined to be in the best interests of the Government." This additional language precluded an automatic interim suspension. (Plaintiff's Exhibit No. 16). The Corps has not sought approval to award the contract to Kiewit as low bidder, as permitted by the JAG letter of December 10, 1981. (Joint Stipulation of Facts ¶ 21).

37. Based upon Kiewit's low bid and the September 3, 1981 findings of the Contracting Officer, Kiewit would have been awarded the Barbers Point contract but for the August 19, 1981 "temporary declaration" of Kiewit's "ineligibility," and the political considerations which led to it. (*See* Findings of Fact 9–20).

38. The August 19, 1981 "temporary declaration" of Kiewit's "ineligibility" has led to stigmatizing publicity damaging to Kiewit's general business reputation. (Plaintiff's Exhibit No. 17).

39. Kiewit has thus been the victim of a *de facto* debarment or suspension since August 1981 without benefit of procedures required by law. (*See* Joint Stipulation of Facts ¶ 22). For nearly five months, the debarment was effected without notice required by DAR § 1–600 *et seq.*, much less any opportunity for a hearing of the issues. (*See* Joint Stipulation of Facts ¶ 22). With the receipt of the apparently misunderstood December 10, 1981 notice, Kiewit will be required, absent relief from this Court, to endure additional periods of *de facto* debarment before evidence has been considered and Kiewit has been found lacking in present responsibility.

40. The taxpayers will also be penalized, as shown by the $2,750,000 which may be wasted at Barbers Point. (*See* Joint Stipulation of Facts ¶ 9).

*The River Bank Stabilization Case; Notice of Proposed Debarment Based Upon a Nolo Contendere Plea*

41. The Corps' August 19, 1981 directive to suspend all awards to Kiewit followed a July 28, 1981 Congressional hearing at which Defendants were sternly criticized for contracting with contractors who had been the subject of prosecutions for anti-competitive practices in connection with Missouri river bank stabilization procurements prior to 1976. (Plaintiff's Exhibit No. 4; Testimony of Lester Edelman).

42. In September 1978 Kiewit agreed to plead *nolo contendere* to a single Sherman Act count in connection with the river bank prosecutions and to pay criminal fines of $100,000. Kiewit subsequently agreed to a decree which requires it to report to the Department of Justice with respect to river bank stabilization work and has paid civil damages totaling $300,000. The plea agreement was not formally entered with the court until April 1981. Kiewit cooperated with the Department of Justice in its prosecution of the river bank offenses. (Plaintiff's Exhibit No. 18; Joint Stipulation of Facts ¶ 5).

43. The Justice Department did not recommend any debarment as a result of Kiewit's *nolo contendere* plea to the Sherman Act count. (Plaintiff's Exhibits Nos. 19 and 20, ¶ 10). It is the position of the Justice Department that:

... the public interest in maximizing free and open competition may not be served by debarment or suspension of firms convicted of antitrust violations, because such debarments might unduly limit the number of potential bidders in a market.

(Plaintiff's Exhibit No. 19).

44. Kiewit became involved in the river bank stabilization work by acquisition of another company in 1967, and the river operations unit represented only .37% of Kiewit Co.'s construction revenues in the period in question (1970–76) and an even smaller percentage of Kiewit Inc.'s revenues. (Joint Stipulation of Facts ¶ 6). The practices in the river bank stabilization procurements were not known to Kiewit executives prior to the initiation of the investigation in 1976. (Testimony of Richard L. Coyne). When Kiewit management became aware of the practices in the river bank stabilization work, it immediately took steps to correct them. (Testimony of Walter Scott, Jr., and Plaintiff's Exhibits). Kiewit terminated the employment of the only two employees who participated in or had knowledge of the anti-competitive activities. (Testimony of Richard L. Coyne).

45. In reports made to the JAG pursuant to DAR § 1–608, the Corps of Engineers had recommended in 1979 and 1980 that there be no debarment of the river bank contractors. (Testimony of Richard L. Coyne; Testimony of Lester Edelman).

46. The Corps reported that there was no evidence of bid rigging or anti-competitive practices by the river bank stabilization contractors since 1976, and no evidence has been presented to this Court to contradict this information. (Plaintiff's Exhibit No. 21).

47. In a report to the JAG dated October 13, 1981, and submitted by the Corps' Chief Counsel, Lester Edelman, the Corps made new recommendations. (Plaintiff's Exhibit No. 21). Mr. Edelman recommended that there be a form of debarment limited to a geographic area related to the river bank stabilization problems. Under Mr. Edelman's recommendation, all fifteen of the river bank companies would be permitted to bid on projects, but if there were any other contractor whose bid came within 125% of the Government's estimate for the project, and who was responsible and responsive, that contractor would receive the award. In the event there were no such other bidder, the Corps would consider the lowest bid from one of the fifteen contractors. (Testimony of Lester Edelman). Outside of the geographic area there would be no debarment of any kind. Thus the

Corps' recommendations would not have precluded award of the Barbers Point contract to Kiewit. (Testimony of Lester Edelman; Plaintiff's Exhibit No. 3, and Tab B thereto).

48. The Corps October 13, 1981 report also transmitted a copy of a letter from the Antitrust Division of the Department of Justice, which reported that, before the indictment, Kiewit "cooperated with the Division," primarily through grand jury testimony. (Plaintiff's Exhibit No. 19).

49. Then, on December 14, 1981, Kiewit counsel received the December 10, 1981 notice addressed to Kiewit's "President" from Brig. Gen. Ronald M. Holdaway, which advised that Kiewit "is being considered for debarment by the Department of the Army pursuant to DAR, section 1–604.1." The basis for the letter was the one-count Sherman Act *nolo contendere* conviction involving river bank stabilization work, more than five years before issuance of the notice. (Plaintiff's Exhibit No. 16).

50. Under the regulations cited in the notice, a conviction, based upon a plea of *nolo contendere* or otherwise, does not, *ipso facto*, support a debarment. Debarment may not be imposed for further punishment. To sustain a debarment, there must be found some threat to Government interests arising from contracting with the debarred contractor. (*See* Joint Stipulation of Facts ¶ 7).

51. The December 10, 1981 notice advised that, pursuant to DAR § 1–604.3, Kiewit could present information "in person, in writing, or through representation." (Plaintiff's Exhibit No. 16). A hearing was held on January 5, 1982 before General Holdaway. (Joint Stipulation of Facts ¶ 20). The JAG has not made a determination and negotiations to resolve the issues and permit award of the Barbers Point contract have failed, notwithstanding encouragement of such negotiations from this Court.

*Other Antitrust Proceedings Involving Kiewit Subsidiaries*

52. Two Kiewit road paving subsidiaries have been convicted of anti-competitive practices in connection with three state and local highway contracts in Kansas and Nebraska. On November 3, 1981, Prairie States Construction Co. was convicted on one Sherman Act and five mail fraud violations involving a federally-funded Kansas contract. On January 14, 1982, Missouri Valley Construction Co. pleaded guilty to bid rigging in connection with two non-federally-funded state and county jobs in Nebraska. Three individuals employed by these subsidiaries have either been convicted or pleaded guilty to similar charges. The subsidiary corporations have paid substantial penalties for these offenses. (Joint Stipulation of Facts ¶¶ 30, 31).

53. Prairie States Construction and Missouri Valley Construction are small subsidiary corporations whose gross revenues in 1980, for example, were $2,414,000 and $10,477,000 respectively; the operations of these subsidiary corporations thus represented .19% and .84% of the gross revenues of Kiewit. (Testimony of Walter Scott, Jr., and Plaintiff's Exhibit No. 23).

54. Two of the individuals involved in these prosecutions have been terminated by Kiewit; the other will be terminated when the period of cooperating with the Justice Department is concluded. (Testimony of Walter Scott, Jr.). None of them had any involvement whatsoever in the preparation or submission of Kiewit's bid on the Barbers Point contract. (Testimony of Walter Scott, Jr.). The division and employees of the division which prepared and submitted the Barbers Point bid have had no involvement in the road paving operations of these convicted subsidiaries. (Testimony of Walter Scott, Jr.).

55. The road paving violations do not involve contracts with the United States, and the road paving convictions have nothing to do with the *de facto* debarment which preceded them; moreover, they do not establish that the entire Kiewit organization, with its 11,000 employees, lacks responsibility; nor do they establish that the division and employees responsible for preparing and submitting Kiewit's Barbers Point bid lack responsibility.

56. The Sherman Act convictions of the small Kiewit road paving subsidiaries do not establish that award of the Barbers Point contract to Kiewit would injure any interests of the United States—particularly in view of the Barbers Point Contracting Officer's finding that "in this instance of the bidding process there was no violation of the Sherman Act or any other statute." (Plaintiff's Exhibit No. 1, ¶ 18).

*Kiewit's Antitrust Compliance Policy*

57. As a result of the anti-competitive practices uncovered in the river bank stabilization and road paving markets and the involvement of Kiewit employees in them, Kiewit has established a stringent antitrust compliance policy which makes clear that anti-competitive practices will not be tolerated and violators of the law will be terminated. (Testimony of Walter Scott, Jr., and Plaintiff's Exhibits Nos. 30 and 32). Each employee with bidding responsibility has signed a statement subscribing to this policy. (Testimony of Richard L. Coyne, and Plaintiff's Exhibits Nos. 33 and 34). In addition, in view of the difficulties with small subsidiaries, Kiewit has tightened its corporate organization, asserting more control from the central office over the operations of its various subsidiary corporations and divisions; this control has focused specifically on antitrust compliance. (Testimony of Walter Scott, Jr.). These steps, instituted in 1981, greatly strengthened the company's pre-existing antitrust compliance policy. (Testimony of Walter Scott, Jr.).

58. These actions, and the importance placed upon them by Kiewit's Chief Executive and Chairman of the Board (Walter Scott, Jr.), were underscored by his closing talk at the January 1982 Annual Meeting of Kiewit. Kiewit's Chief Executive said:

> You should know what steps we're taking to prevent a recurrence of the violations that have so seriously damaged our reputation:
>
> 1. The Board of Directors, with the help of expert outside advice, adopted an even more stringent policy spelling out penalties for any violations of the law. In fact, it is the most stringent we

know of. We want to be absolutely sure these violations will not occur again. Our officers and directors will not tolerate such activity.

> 2. Dick Coyne [chief counsel] has met with every U. S. employee who has bidding responsibility to be sure they understand the policy. Each of those individuals has signed a statement subscribing to it. We will continue to review those statements annually.
>
> 3. Our Internal Audit Department will spend more of its efforts checking district business practices.
>
> 4. I discussed our anti-trust policy with every manager during our wage review conferences last March and explained that we will not defend a law violator and will not keep him on the payroll. Lawbreakers cannot and will not be stockholders of our company.
>
> When and if we discover collusion anywhere in our organization, we will cooperate fully with law enforcement agencies in their investigation as we did in the river investigation and the Missouri Valley case.

(Testimony of Walter Scott, Jr., and Plaintiff's Exhibit No. 32).

*Congressional Contacts with Defendants*

59. Early in 1981, the Chief Counsel for the Corps, Mr. Lester Edelman, received several telephone calls from staff personnel of the Subcommittee on Oversight of Government Management, Senate Committee on Government Affairs, of which Senator Levin is a member, inquiring into the Corps' dealings with the river bank contractors. Subsequently, some of these staff members came to the Corps' office in Washington, D. C. to review documents on the subject. (Testimony of Lester Edelman).

60. Thereafter, on July 17, 1981, at the request of Senator Levin, Mr. Edelman also provided the Senator with copies of letters "written by former and present Corps of Engineers officials to Judge Adrian Duplantier [the presiding judge in the river bank case] concerning certain defendants convicted of price fixing activities." (Let-

ter dated July 17, 1981, from Lester Edelman to The Honorable Carl M. Levin).

61. Soon afterwards, on July 28, 1981, while questioning the Deputy Secretary of Defense, Mr. Carlucci, during Senate hearings, Senator Levin strongly criticized the Corps and the Department of Defense for doing business with the river bank contractors, and added that he found the continued contracting to be "unbelievable." Mr. Carlucci responded that he would look into the matter. (Plaintiff's Exhibit No. 4 at 2–3).

62. Within two days of this hearing, the Assistant to Mr. Carlucci gave the Chief of Engineers of the Corps a copy of an AP press release describing Senator Levin's criticism of Mr. Carlucci, and requested, on behalf of Mr. Carlucci, that the Chief of Engineers provide "ASAP" a "fact sheet" concerning the Corps' contracting practices in 1978. Such a fact sheet was prepared on July 31, 1981, by the Assistant Chief of Engineers. (Document entitled "Disposition Form" dated July 31, 1981, from Brigadier General W. G. Delbridge, Jr., Assistant Chief of Engineers).

63. Also on July 31, 1981, Senator Levin followed up his questioning of Mr. Carlucci with a letter to the Secretary of Defense, Caspar Weinberger, requesting detailed information regarding, among other things, the Corps' recommended debarment or suspension proceedings against the river bank firms and the procedures for pursuing a debarment or suspension. Copies of this letter were sent to Mr. Carlucci, the Chief of Engineers, and to the Secretary of the Army. (Letter dated July 31, 1981, from Senator Levin to The Honorable Caspar W. Weinberger, Secretary of Defense).

64. Senator Levin's questions to Mr. Weinberger were passed down through Department of Defense channels to the Corps to be answered. (Testimony of Lester Edelman).

65. Within 10 days of the Congressional hearing and several days after Senator Levin's letter, Mr. Edelman also received an unusual number of requests from other highly-placed Department of Defense and Army officials for information concerning the Corps' dealings with the river bank stabilization contractors. (Testimony of Lester Edelman). In response to these requests, Mr. Edelman briefed several officials—including the General Counsel of the Army, the Assistant Secretary of the Army for Civil Works, and the Special Assistant Secretary of Defense—on the Corps' position with respect to debarment of the river bank contractors. (Testimony of Lester Edelman).

66. Although from 1978 until the foregoing actions by Senator Levin and defendants in late July and early August of 1981, the Corps had continued to contract with the river bank contractors, including Kiewit, and had recommended no debarment of them, within days after these actions the Corps issued its directive of August 19, 1981, suspending awards to the river bank contractors.

67. In conversations in which Kiewit inquired about the August 19, 1981 directive, Mr. Edelman referred to Senator Levin's criticisms at the July 28, 1981 hearings. (Testimony of Lester Edelman).

68. Senator Levin's criticisms of the Department of Defense and the Corps were reported by the press. For example, in an article published in the St. Louis Post Dispatch, written in September of 1981, the Senator's questioning of Mr. Carlucci and his letter to the Secretary of Defense were noted, as was the Corps' continued contracting with the river bank contractors. (Plaintiff's Exhibit No. 17).

69. Subsequently, Senator Levin made statements to the press, stating, for example, that he saw "no solid, justifiable reasons" why the river bank companies should not be debarred. (Plaintiff's Exhibit No. 17: Kansas City Star, October 18, 1981). The Corps was aware of these statements. (Testimony of Lester Edelman).

70. One of the principal factors in the Corps' decision to suspend awards to the river bank contractors, including Kiewit, was the public's perception of the Corps, as represented, in part, by such publicity. (Testimony of Lester Edelman).

71. On September 23, 1981, the Secretary of the Army responded in detail, on behalf of the Secretary of Defense, to Senator Levin's July 31, 1981, letter. (Letter dated September 23, 1981, from John O. Marsh, Jr., to the Honorable Carl M. Levin).

72. In late-October, 1981, Kiewit's counsel, Richard L. Coyne, asked General Heiberg, the Corps' Director of Civil Works, whether award of the Barbers Point contract was going to be made to Kiewit. General Heiberg replied that he would recommend award but that, if he did so, it might "stir up" Senator Levin on the debarment issue again, and be detrimental to Kiewit on the ultimate debarment question. (Testimony of Richard L. Coyne).

73. General Heiberg subsequently did attempt to have the Barbers Point contract awarded to Kiewit, but his efforts were blocked by higher authorities because of concern for future Congressional criticism. (Testimony of Richard L. Coyne).

74. The potential for such future Congressional criticism of the Corps was considered by the Corps in making its procurement decisions with regard to the river bank contractors. (Testimony of Lester Edelman).

75. On January 12, 1982, subsequent to the institution of this case and the commencement of debarment proceedings by JAG against Kiewit, Senator Levin wrote the Secretary of the Army asking further questions about the river bank contractors, and asking, with specific reference to Kiewit, the following:

> I have just received word that at least one of the firms, Peter Kiewit Sons' Company, recently received notice of proposed debarment from the Office of Judge Advocate General, and that the firm has participated in an administrative hearing concerning the proposed debarment. Why was I not informed of this new development?
>
> \* \* \* \* \* \*
>
> 3) With respect to Peter Kiewit Sons' Company, when do you expect to make a final decision on debarment based on the administrative hearing? Is the company currently under consideration for any additional contract awards? If so, are there any other bidders on such contracts capable of performing the work on said contracts?

(Letter dated January 12, 1982, from Senator Levin to The Honorable John O. Marsh, Jr., Secretary of the Army).

76. Furthermore, in that same letter, Senator Levin questioned the DOD's actions with respect to negotiations between the Judge Advocate General and Kiewit that had been ordered by this Court on December 30, 1981:

> I also recently received word that the Judge Advocate General is considering dropping the proposed debarment of Peter Kiewit Sons' Company, in exchange for an agreement by the firm that it will not bid on any additional Corps projects involving bank stabilization work on the lower Mississippi River. If so, would not that participation on Corps projects in other areas of the country jeopardize the integrity of the procurement process and run contrary to the Government's interests?

(Letter dated January 12, 1972, from Senator Levin to The Honorable John O. Marsh, Jr., Secretary of the Army).

77. Senator Levin also sent a letter to the Deputy Secretary of Defense on January 12, 1982, asking why the Department of Defense had not informed him of the proceedings with respect to Kiewit and enclosing a copy of his letter of the same day to Secretary of the Army. (Letter dated January 12, 1982, from Senator Levin to The Honorable Frank C. Carlucci, Deputy Secretary of Defense).

78. At about the same time as the January 12, 1982, letters from Senator Levin, Mr. Edelman received a telephone call from one of Senator Levin's staff members, who requested that Mr. Edelman meet with Senator Levin. Mr. Edelman thereafter asked the Deputy Judge Advocate General, Major General Overholt, to attend the meeting with him. Subsequently, the Assistant Secretary of the Army for Civil Works, Mr.

Gianelli, also asked if he could go to the meeting. (Testimony of Lester Edelman).

79. The meeting with the Senator took place on January 25, 1982, one week before the hearing on the merits in this matter and while the JAG was considering whether to negotiate with Kiewit (pursuant to this Court's consent order of January 18, 1982). This is indicated in the Secretary of the Army's response to the Senator's August 12, 1982 questions with respect to Kiewit and others, in which the Secretary of the Army stated:

> Later today the Assistant Secretary of the Army for Civil Works, Mr. William Ginanelli, will be visiting with you to discuss this matter. He plans to cover the questions raised in your letter.

(Letter dated January 25, 1982, from the Secretary of the Army, John O. Marsh, Jr., to The Honorable Carl M. Levin).

80. At the meeting, on-going litigation in the United States District Court for the Eastern District of Louisiana, which involves the river bank contractors, including Kiewit, was discussed. Senator Levin or one of his staff inquired whether the Justice Department was giving the JAG adequate support in the proceeding before Judge Duplantier. (Testimony of Lester Edelman).

81. A letter from Mr. Carlucci to Senator Levin, dated January 28, 1982, describing the meeting, also indicates that the debarment proceedings and the present litigation were discussed:

> It is my understanding that Secretary Marsh has responded to your questions and that, in addition, on Monday you met with Assistant Secretary of the Army For Civil Works, William R. Gianelli, Major General Overholt, Assistant Judge Advocate General, and Mr. Lester Edelman, Chief Counsel of the Corps of Engineers for further discussion of this matter. I believe they brought you up-to-date concerning *the status of the proceedings and litigation in progress at the present time, and further, that the Judge Advocate General and the Chief Counsel of the Corps will keep you informed on these proceedings.* [Emphasis added.]

(Letter dated January 28, 1982, from the Deputy Secretary of Defense to The Honorable Carl M. Levin).

82. Two days after this meeting, the JAG informed Kiewit that it would not negotiate further with Kiewit on the subject of debarment.

83. The actions described above occurred while (1) the Corps was determining whether to suspend contract awards to the river bank contractors; (2) the Corps was formulating and reconsidering its recommendations on debarment of the river bank contractors; (3) the Corps was deciding whether to recommend award to Kiewit of contracts, including the Barber's Point contract, in light of the August 19, 1981, Corps' directive; (4) the Army Judge Advocate General was deciding to institute debarment proceedings against the river bank contractors; and (5) during the pendency of the debarment proceedings instituted by General Holdaway's notice of December 10, 1981.

*Status of the Barbers Point Contract and Ultimate Factual Conclusions With Respect To It*

84. Award of the Barbers Point contract has been withheld, pursuant to a temporary restraining order and subsequently the consent of Defendants, until the hearing on the merits of Kiewit's complaint. Defendants have asserted that there is some urgency in making the award; based on these assertions, the Court finds that, while not urgent, there is a need to proceed and certainly no basis (apart from insuring that Constitutional rights are not violated and public funds are not wasted in this case) to delay award.

85. There is no question as to Kiewit's capacity to perform the contract. (Joint Stipulation of Facts ¶ 25; Plaintiff's Exhibit No. 1).

86. There is no evidence that Kiewit acted improperly or irresponsibly in connection with the Barbers Point procurement. Defendants have stipulated to this effect. Given the stipulation and the absence of

any such evidence, the Court adopts, as its own finding, the finding of the Contracting Officer that "in this instance of the bidding process there was no violation of the Sherman Act or any other statute." (Plaintiff's Exhibit No. 1, ¶ 18).

87. Award of the Barbers Point contract to Kiewit would not injure any legitimate interests of the United States. The public interest would be served by award to Kiewit by a saving of public funds in the amount of $2,750,000.

## CONCLUSIONS OF LAW

*Jurisdiction and Standing*

1. The Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(e).

■ 2. An allegation of facts which reveals an absence of due process, legal authority, or basic fairness in the method of imposing debarment presents a justiciable controversy. *See, e.g., Gonzalez v. Freeman*, 334 F.2d 570, 574–75 (D.C.Cir.1964); *Art-Metal-USA, Inc. v. Solomon*, 473 F.Supp. 1, 4 n. 5 (D.D.C.1978). Where governmental blacklisting is involved, a "liberty interest" of the plaintiff is at stake. It is the "right to be free from stigmatizing governmental defamation having an immediate and tangible effect on its ability to do business." *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 961 (D.C.Cir.1980).

■ 3. Plaintiff also has standing to challenge, as arbitrary, capricious, or otherwise contrary to law, the rejection of its low bid. 5 U.S.C. § 702; *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C.Cir. 1970).

*Due Process Violation: Illegal De Facto Debarment or Suspension*

4. The Barbers Point contract was not awarded to Kiewit because of an August 19, 1981 directive that all contract awards to Kiewit were to be held in "abeyance" for an indefinite period of time. This directive prevented award to Kiewit notwithstanding the Contracting Officer's recommendation to award and his finding that Kiewit's bid involved no impropriety. This abeyance declared Kiewit temporarily ineligible for contract awards and constituted a *de facto* debarment of Kiewit. *See Art-Metal-USA, Inc. v. Solomon*, 473 F.Supp. 1, 5 (D.D.C. 1978).

■ 5. Due process of law under the Constitution requires that before such a suspension or debarment is effected, the contractor must be afforded specific procedural safeguards, including a notice of the charges against it, an opportunity to rebut those charges, and, under most circumstances, a hearing. *E.g., Myers & Myers, Inc. v. U.S. Postal Service*, 527 F.2d 1252, 1259 (2d Cir. 1975); *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C.Cir.1972); *Gonzalez v. Freeman*, 334 F.2d 570, 578 (D.C.Cir.1964); *Art-Metal-USA, Inc. v. Solomon*, 473 F.Supp. 1, 4 (D.D.C.1978). These procedural safeguards are also required by the relevant regulations, DAR § 1–600 *et seq.*

■ 6. The fact that Defendants label the directive barring awards to Kiewit as an "abeyance" and a "temporary declaration of ineligibility," instead of a suspension or debarment, is inconsequential, for Defendants cannot bypass these important procedural safeguards merely by omitting the formal label to the sanction applied. *E.g., Myers & Myers, Inc. v. U.S. Postal Service*, 527 F.2d 1252, 1259 (2d Cir. 1975).

7. In this case, for a period of nearly five months, Kiewit was denied contracts under a stigmatizing, Congressionally induced cloud of lack of responsibility, but was not afforded the Constitutionally-required notice and opportunity to be heard.

■ 8. Although it may be lawful in exceptional circumstances to suspend a contractor temporarily pending an investigation without providing the requisite notice and hearing, the period of such a temporary suspension should not exceed thirty days and should be countenanced only in extreme situations such as those involving national security. *See Horne Bros., Inc. v.*

*Laird*, 463 F.2d 1268, 1270; *Art-Metal-USA, Inc. v. Solomon*, 473 F.Supp. 1, 6 & n. 14 (D.D.C.1978). This case does not involve such exceptional circumstances. Moreover, the thirty-day limit was long exceeded.

■ 9. The impropriety of Defendants' failure to provide Kiewit with the requisite notice and opportunity to be heard for more than four months was not cured by the after-the-fact issuance of the notice of proposed debarment dated December 10, 1981, or by the debarment hearing held on January 5, 1982. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense, supra*, 631 F.2d at 966–67.

■ 10. Because Kiewit did not receive the Constitutionally-mandated procedural safeguards and was denied due process of law, it is entitled to relief. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense, supra*, 631 F.2d at 969.

*Alternative Illegality: Asserted Grounds for Denying Kiewit the Barbers Point Contract Constitute Improper Penalty*

■ 11. Pursuant to the Defense Acquisition Regulations § 1–604, a contractor may be debarred or suspended, or otherwise denied a contract based upon a conviction, if such action is necessary "for the purpose of protecting the interest of the Government." A contractor may *not* be delisted, blacklisted, or otherwise denied contracts "for punishment." *Roemer v. Hoffmann*, 419 F.Supp. 130 (D.D.C.1976).

12. These regulatory prerequisites are rooted in fundamental principles of due process of law. Debarment or suspension shall not be a vehicle for imposition of a penalty or punishment. Only the federal courts may impose sanctions for violations of the Sherman Act, which was done here. Debarment or suspension is not a sanction for violation of the Sherman Act. 15 U.S.C. § 1. Accordingly, although the Court exercises a limited review of procurement decisions, the Court cannot sustain or permit the denial of a contract if such action is a punishment.

■ 13. To sustain such a denial of the contractor's liberty interest, it must therefore, be established that contract awards to the subject contractor involve a threat to the interest of the Government. Otherwise, the contract denial would constitute an illegal punishment. *See Roemer v. Hoffmann, supra.*

■ 14. Because of the Contracting Officer's and the Court's specific finding that "there was no violation of the Sherman Act or any other statute" in the Barbers Point bidding process and Defendants' stipulation that there was no impropriety (Findings of Fact 12, 86), denial of the Barbers Point contract to Kiewit, on grounds of prior or unrelated Sherman Act convictions, would constitute an illegal punishment.

15. Because of the undisputed fact, reported by the Corps of Engineers, that there is no evidence of bid rigging practices on river bank stabilization procurements since 1976 (Finding of Fact 46), or over five years ago, denial of the Barbers Point contract on the basis of the river bank stabilization convictions, as cited in the December 10, 1981 notice, would constitute an improper punishment and a denial of fundamental due process and also be irrational and contrary to law.

16. Because of the fact that the Kiewit employees who participated in the Barbers Point procurement had no involvement in either river bank procurements referenced in the December 10, 1981 notice or the road paving procurements which led to the convictions in Kansas and Nebraska (Findings of Fact 44, 54, 55) and there is no impropriety in connection with the Barbers Point contract (Findings of Fact 12, 55, 86), denial of the Barbers Point contract based upon these matters would constitute an improper punishment, and worse, an improper punishment of individuals who committed no wrongs. *See Gonzalez v. Freeman, supra*, 334 F.2d at 578–79 n.17.

17. Defendants have shown no threat to the interests of the United States that might result from award of the Barbers Point contract to Kiewit, the low bidder;

absent such a showing, denial of the award constitutes an unlawful punishment.

18. Additionally, the denial of the contract award to Kiewit would be improper because it is based upon Kiewit's plea of *nolo contendere* in the river bank case. Fed.R.Crim.Pro. 11(e)(6); Fed.R.Evid. 410 and 803(22); 15 U.S.C. § 16(a).

*Alternative Illegality: Arbitrary and Capricious Action*

■ 19. Based upon the finding (by the Contracting Officer and the Court) and stipulation that there has been no impropriety in connection with the Barbers Point bidding process (Findings of Fact 12, 86), the admitted capacity of Kiewit to perform (Finding of Fact 85), and the public saving of $2,750,000 offered by Kiewit's low bid (Finding of Fact 87), it is arbitrary and capricious and therefore unlawful under 5 U.S.C. § 706 for Defendants to deny Kiewit the Barbers Point award.

20. This conclusion is further supported by the finding that, prior to the August 19, 1981 directive and in one case subsequent thereto, Defendants made awards to Kiewit without damage or harm to the public interest or evidence of irresponsibility on Kiewit's part (Findings of Fact 19, 26)—indeed with benefit to the public interest because of Kiewit's competitive low bids. Given the findings and stipulations in this case, there is no rational basis for distinguishing these situations.

21. The December 10, 1981 notice from General Holdaway permits award to Kiewit if it is determined to be in the best interests of the Government. The Corps of Engineers has arbitrarily and capriciously failed to seek approval of award to Kiewit pursuant to this notice. The Court concludes, based upon the finding and stipulation that there has been no impropriety in connection with the Barbers Point bidding process and the admitted capacity of Kiewit to perform, that it is manifestly in the interests of the United States to save the taxpayers $2,750,-000.

*Alternative Illegality: Denial of Contract Improperly Based Upon Abdication of Procurement Responsibility and Congressional Interference*

■ 22. The Defendant Acquisition Regulations appoint, authorize, and charge procurement officers with the duty to make the decision whether to award a contract such as Barbers Point. Abdication of these responsibilities, or worse, frustration of the exercise of these responsibilities, is itself illegal. *Schlesinger v. United States*, 390 F.2d 702, 705–08 (Ct.Cl.1968) (illegal termination for default because based on Congressional inputs); *see Discount Co. v. United States*, 213 Ct.Cl. 567, 554 F.2d 435, 441 n. 9 (1977); *Fischbach & Moore v. United States*, 617 F.2d 223, 226 n. 7 (Ct.Cl.1980).

23. The record shows that, in this case, a number of decisions by cognizant procurement officials were reversed, reconsidered, or rejected because of concern for Congressional criticism.

24. Most significantly, the Contracting Officer's (a) determination that it is in the best interest of the Government to award the Barbers Point contract to Kiewit, in view of the potential saving of $2,750,000 and his finding that there was no impropriety in the bidding process, and (b) his recommendation that award be made to Kiewit, was rejected and set aside because of concern about Congressional or public criticism. The efforts of higher level Corps officials to award the contract to Kiewit were blocked for the same reason. (Findings of Fact 12–18, 28–30).

25. In *Schlesinger v. United States, supra,* the Court of Claims described the factual circumstances as follows:

Although the Congressional communication does not appear to have suggested that the plaintiff's contract be canceled without consideration of his rights or situation, or even that it be terminated for default rather than for convenience (which would give the contractor his reasonable expenses to date), the Navy acted as if it had no option but to terminate for default (barring all compensation) once the mere fact of non-delivery was found. [390 F.2d at 708].

The Court of Claims held the default termination illegal, on the basis of this legal principle:

> Such abdication of responsibility we have always refused to sanction where there is administrative discretion under a contract. *New York Shipbuilding Corp. v. United States*, 385 F.2d 427, 435, 436–37, 180 Ct.Cl. 446, 460 (June 1967), and cases cited. This protective rule should have special application for a default-termination which has the drastic consequence of leaving the contractor without any further compensation. [390 F.2d at 709.]

This principle should have even more application to the even more drastic sanction of blacklisting, which is basically one of the practical results in the case at bar.

26. In *The Pillsbury Co. v. FTC*, 354 F.2d 952 (5th Cir. 1966), a Federal Trade Commission order was reversed and set aside, because Congressional intervention in the form of questioning (at a legislative hearing) of the correctness of the agency's approach deprived the corporation involved of due process. The Court said:

> There are those who "take a rather dim view of [such] committee pronouncements as to what agency policy should be, save when this is incident to proposals for amendatory legislation." Friendly, The Federal Administrative Agencies 169 (Harvard University Press 1962). Although such investigatory methods raise serious policy questions as to the *de facto* "independence" of the federal regulatory agencies, it seems doubtful that they raise any constitutional issues. However, when such an investigation focuses directly and substantially upon the mental decisional processes of a Commission *in a case which is pending before it*, Congress is no longer intervening in the agency's *legislative* function, but rather, in its *judicial* function. At this latter point, we become concerned with the right of private litigants to a fair trial and, equally important, with their right to the appearance of impartiality, which cannot be maintained unless those who exercise the judicial function are free from powerful external influences. See *In re Murchi-*

*son*, 349 U.S. 133, 136, 75 S.Ct. 623 [625], 99 L.Ed. 942 (1955); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68, 74 S.Ct. 499 [503], 98 L.Ed. 681 (1954). "A first principle of Anglo-American jurisprudence, * * * basic to the conception of due process in the procedural sense" is that the ends do not justify the means." Douglas, We The Judges 354 (Doubleday 1956).

> To subject an administrator to a searching examination as to how and why he reached his decision in a case still pending before him, and to criticize him for reaching the "wrong" decision, as the Senate subcommittee did in this case, sacrifices the appearance of impartiality— the *sine qua non* of American *judicial* justice—in favor of some short-run notions regarding the Congressional intent underlying an amendment to a statute, unfettered administration of which was committed by Congress to the Federal Trade Commission (See 15 U.S.C.A. 21).

> It may be argued that such officials as members of the Federal Trade Commission are sufficiently aware of the realities of governmental, not to say "political," life as to be able to withstand such questioning as we have outlined here. However, this court is not so "sophisticated" that it can shrug off such a procedural due process claim merely because the officials involved should be able to discount what is said and to disregard the force of the intrusion into the adjudicatory process. We conclude that we can preserve the rights of the litigants in a case such as this without having any adverse effect upon the legitimate exercise of the investigative power of Congress. What we do is to preserve the integrity of the judicial aspect of the administrative process. See *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999 [1004], 85 L.Ed. 1429 (1941). [354 F.2d at 964.]

Also, *D. C. Federation v. Volpe*, 459 F.2d 1231 (D.C.Cir.1971).

27. In *Texas Medical Association v. Matthews*, 408 F.Supp. 303 (W.D.Texas 1976), the Court set aside agency action which it

found was based, in part, on pressures emanating from Congressional sources. The Court said:

 The controlling principle of law thus enunciated in *D. C. Federation v. Volpe* is that agency action is invalid if based, even in part, on pressures emanating from Congressional sources. Through an array of administrative law precepts reviewing courts are properly constrained from substituting their own judgment for that of the administrative agency. But those precepts presuppose that the judgment being thus protected is the agency's own legitimate judgment. Where pressures from Congressional sources have, in the words of *D. C. Federation v. Volpe,* "intruded into the calculus of considerations on which the Secretary's decision was based," then the resulting judgment is unlawful ab initio and not entitled to the sanctuary accorded untainted agency judgments. [408 F.Supp. at 306–07.]

*See also Center on Corporate Responsibility, Inc. v. Shultz,* 368 F.Supp. 863 (D.D.C.1973) ("A showing of political influence renders the Service's ruling null and void. It is outside the law").

28. The Congressional intervention and Defendants' responsiveness to it are clear on this record. Concern over Congressional criticism is not a proper basis for *de facto* debarment. Congressional oversight is an important Governmental process, but it may not properly invade administrative determinations such as this, particularly where liberty interests are at stake and due process is required.

*Alternative Illegality: Congressional Interference Has Rendered the Debarment Proceedings Null and Void*

 29. The testimony at trial and the documents submitted by order of the Court immediately subsequent to the trial (described in Findings of Fact 59–83), establish that the Congressional intervention continued and intensified subsequent to the commencement of the December 10, 1981, formal debarment procedures against Kiewit.

30. There was critical Congressional inquiry into the decisional processes attending the proposed debarment of Kiewit in the proceeding pending before Defendants. The critical inquiries focused specifically upon the resolution of the debarment proceeding. This Congressional intervention was effected at all relevant levels of the chain of command of the Department of Defense, the Department of the Army, the Judge Advocate General's Office, and the Corps (see Findings of Fact 59–83).

31. These *ex parte* Congressional communications about the merits of a specific debarment proceeding violate the due process requirements that necessarily attend an agency proceeding where a contractor's liberty interests are at stake. *See The Pillsbury Company v. FTC, supra.*

32. Given these occurrences, which at the very minimum sacrifice the appearance of impartiality of the agency decisionmakers, the Court concludes that the integrity of the quasi-judicial aspect of the administrative debarment process has been compromised. *The Pillsbury Company v. FTC, supra* at 954. *See Home Box Office, Inc. v. Federal Communications Commission,* 567 F.2d 9, 51–57 (D.C.Cir.1977).

33. As a consequence of these circumstances, any judgment rendered by Defendants with respect to the debarment or suspension of Kiewit is and would be unlawful *ab initio* and not entitled to the judicial deference usually accorded untainted agency judgments. *See Texas Medical Association v. Matthews,* 408 F.Supp. 303 (W.D. Tex.1976).

34. In light of (1) the foregoing conclusions that the administrative debarment proceeding has been tainted and is not entitled to deference and that the agency's decisionmaking process has been compromised; (2) the fact that Kiewit has been subjected to a continuing stigmatizing blacklisting and deprivation of its liberty interests, which must be abated; and (3) the need to proceed with the Barbers Point procurement (Finding of Fact 84) and to remove the stigmatizing cloud surrounding Kiewit with respect to future procurements, it is necessary and appropriate for the

Court now to determine whether Kiewit should be debarred.

35. In this case, the Court has heard and considered the evidence relating to Kiewit's present responsibility. This evidence includes (a) Kiewit's longstanding record of performance on numerous, substantial construction projects for the United States, which, for example, have had a total value from 1970 to 1981 of $1,301,693,883.00 (Finding of Fact 6); (b) the fact that between September 1978 and the commencement of the *de facto* debarment or suspension Defendants have on at least 12 different occasions determined Kiewit to be responsible and awarded contracts to Kiewit without injury to public interests (Finding of Fact 21); (c) the fact that, indeed, as recently as November 27, 1981, the Defendants awarded to Kiewit an important national-defense-related contract, at the Alameda Naval Air Station, without injury to public interests (Findings of Fact 26–27); (d) the findings and stipulations that there was no impropriety in the Barbers Point bidding process (Finding of Fact 86); (e) Kiewit's admitted capacity to perform (Finding of Fact 85); (f) the Contracting Officer's recommendations that award be made to Kiewit as in the best interests of the Government (Findings of Fact 11–13); (g) the fact that in the case of the conviction of two of Kiewit's small road paving subsidiaries, the company has reacted vigorously by terminating the few individuals involved in the wrong-doing (Finding of Fact 53); (h) the fact that these two subsidiaries account for miniscule portions of the gross revenues of Kiewit (Finding of Fact 53); (i) the fact that, overall, Kiewit employs over 11,000 employees and is engaged in all types of contracting work (Findings of Fact 4–6); and (j) the comprehensive antitrust compliance program that Kiewit has implemented to prevent any similar antitrust violations (Findings of Fact 57–58).

36. Based upon the foregoing evidence, the Court concludes that Kiewit is presently responsible, that no material interests of the United States would be injured by contracting with Kiewit and that Kiewit therefore may not properly be denied the Bar-

bers Point contract. *See Roemer v. Hoffmann, supra*, 419 F.Supp. at 131–132.

37. In these circumstances, denial of the contract would constitute a punishment, contrary to DAR § 1–604 and, worse, a punishment of those who have committed no wrongs. *See Gonzalez v. Freeman, supra*, 334 F.2d at 578–79 n.17.

38. Indeed, it appears to the Court by a preponderance of the evidence that the best interests of the United States will be furthered by the presence of Kiewit as a vigorous competitor for Government contracts, as evidenced by the $118,766,710.00 its low bids saved the United States between 1970 and 1981 (Finding of Fact 7) and the $2,750,000.00 that will be saved by the United States on the Barbers Point contract alone (Findings of Fact 7).

39. Based upon the findings of fact and alternative conclusions of law set forth above, the Court concludes that the defendants' actions initiated on August 19, 1981, and the rejection of Kiewit's low bid on the Barbers Point contract are unconstitutional and unlawful under 5 U.S.C. § 706(2)(A), (B), (C) and (D).

*Relief to be Granted Under the Circumstances*

40. The Court also concludes that Defendants have unlawfully withheld the Barbers Point contract from Kiewit and that, pursuant to 5 U.S.C. § 706(1), such unlawfully withheld agency action must be compelled. *See Superior Oil Co. v. Udall*, 409 F.2d 1115, 1121–22 (D.C.Cir.1969); *Keco Industries v. Laird*, 318 F.Supp. 1361, 1364 (D.D.C.1970). In reaching this conclusion, the Court refers to (a) the findings and stipulation that there was no impropriety in the Barbers Point bidding process (Finding of Fact 86), (b) Kiewit's admitted capacity to perform (Findings of Fact 85), (c) the Contracting Officer's recommendation that award be made to Kiewit as in the best interests of the Government (Findings of Fact 11–13), and (d) Defendants' urgings that there is a need to proceed with award without delay (Finding of Fact 84).

41. The Court also concludes that the suspension begun in August, 1981, cannot be permitted to continue further, and therefore that Defendants must be restrained from perpetuating this stigmatizing interference with Kiewit's rights through any form of further action regarding the Barbers Point contract. *Roemer v. Hoffmann, supra,* 419 F.Supp. at 132 (order enjoining Department of Army pending proper debarment proceeding).

42. The Court also concludes that Kiewit is presently responsible and that no material interests of the United States would be injured by contracting with Kiewit. Therefore, the Court declares that plaintiff should not be prevented from doing business with the United States on the basis of the record before it.

An Order consistent with these findings and conclusions will be entered of even date herewith.